**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
CASE NO.

LUXOTTICA GROUP S.p.A., and OAKLEY,
INC.,

                Plaintiffs,

vs.

THE INDIVIDUALS, BUSINESS ENTITIES
AND UNINCORPORATED ASSOCIATIONS
IDENTIFIED ON SCHEDULE "A,"

                Defendants.

_____

## COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

Plaintiffs, Luxottica Group S.p.A., and Oakley, Inc. (collectively "Plaintiffs"), hereby sue Defendants, the Individuals, Business Entities, and Unincorporated Associations identified on Schedule "A" (collectively "Defendants"). Defendants are promoting, selling, offering for sale and distributing goods bearing and/or using counterfeits and confusingly similar imitations of Plaintiffs' respective trademarks within this district through various Internet based e-commerce stores operating under the seller identities set forth on Schedule "A" hereto (collectively the "Seller IDs"). In support of their claims, Plaintiffs allege as follows:

## JURISDICTION AND VENUE

1.      This is an action for damages and injunctive relief for federal trademark counterfeiting and infringement, false designation of origin, common law unfair competition, and common law trademark infringement pursuant to 15 U.S.C. §§ 1114, 1116, and 1125(a) and 1125(d), The All Writs Act, 28 U.S.C. § 1651(a), and Florida's common law.  Accordingly, this Court has subject matter jurisdiction over this action pursuant to 15 U.S.C. § 1121 and 28 U.S.C.

§§ 1331 and 1338. This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over Plaintiffs' state law claims because those claims are so related to the federal claims that they form part of the same case or controversy.

2.    Defendants are subject to personal jurisdiction in this district, because they direct business activities toward and conduct business with consumers throughout the United States, including within the State of Florida and this district, through at least, the Internet based e-commerce stores accessible and doing business in Florida and operating under the Seller IDs. Alternatively, based on their contacts with the United States, Defendants are subject to personal jurisdiction in this district pursuant to Federal Rule of Civil Procedure 4(k)(2) because (i) Defendants are not subject to jurisdiction in any state's court of general jurisdiction; and (ii) exercising jurisdiction is consistent with the United States Constitution and laws.

3.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391 since Defendants are, upon information and belief, non-resident in the United States and engaged in infringing activities and causing harm within this district by advertising, offering to sell, selling, and/or shipping infringing products into this district.

## THE PLAINTIFFS

4.    Plaintiff, Luxottica Group S.p.A. ("Luxottica"), is a corporation organized under the laws of Italy with its principal place of business in Milan, Italy, and an office in the United States located at 4000 Luxottica Place, Mason, Ohio 45040-8114. Luxottica is, and for years has been, a global leader in the design, manufacture and distribution of fashion, sports and performance eyewear. Luxottica is, in part, engaged in the business of producing, manufacturing and distributing throughout the world, including within this district, a variety of high-quality goods and sports eyewear products under multiple world-famous common law and federally registered

trademarks, including but not limited to the RAY-BAN® family of marks, as discussed in Paragraph 16 below.

5.      Plaintiff, Oakley, Inc. ("Oakley"), is a corporation organized under the laws of the State of Washington with its principal place of business at One Icon, Foothill Ranch, California 92610. Oakley is a wholly owned subsidiary of Luxottica Group S.p.A. ("Luxottica").[1] Oakley is, and for years has been, a global leader in the design, manufacture and distribution of sports performance equipment. Oakley is, in part, engaged in the business of manufacturing and distributing throughout the world, including within this district, a variety of high-quality sports performance and lifestyle goods under multiple world-famous common law and federally registered trademarks, as discussed in Paragraph 25 below.

6.      Plaintiffs' offer for sale and sell their trademarked goods within the State of Florida, including this district, and throughout the United States. Defendants, through the offering for sale and sale of counterfeit and infringing versions of Plaintiffs' respective branded products, are directly and unfairly competing with each Plaintiffs' economic interests in the United States, including the State of Florida, and causing each Plaintiff irreparable harm and damage within this jurisdiction.

7.      Like many other famous trademark owners, Plaintiffs suffer ongoing daily and sustained violations of its trademark rights at the hands of counterfeiters and infringers, such as Defendants herein, who wrongfully reproduce and counterfeit Plaintiffs' individual trademarks for the twin purposes of (i) duping and confusing the consuming public and (ii) earning substantial profits across their e-commerce stores. The natural and intended byproduct of Defendants' combined actions is the erosion and destruction of the goodwill associated with Plaintiffs'

---

[1] The Plaintiffs are related ultimate subsidiaries of EssilorLuxottica S.A., a French corporation.

respective famous names and associated trademarks and the destruction of the legitimate market sector in which they operate.

8.      To combat the indivisible harm caused by the concurrent actions of Defendants and others engaged in similar conduct, each year Plaintiffs expend significant resources in connection with trademark enforcement efforts. The exponential growth of counterfeiting over the Internet, including through online marketplace and social media platforms, has created an environment that requires companies, such as Plaintiffs, to expend significant resources across a wide spectrum of efforts in order to protect both consumers and themselves from confusion and the erosion of the goodwill embodied in Plaintiffs' respective brands.

## THE DEFENDANTS

9.      Defendants are individuals, business entities of unknown makeup, or unincorporated associations, each of whom, upon information and belief, either reside and/or operate in foreign jurisdictions, redistribute products from the same or similar sources in those locations, and/or ship their goods from the same or similar sources in those locations to shipping and fulfillment centers within the United States to redistribute their products from those locations. Defendants have the capacity to be sued pursuant to Federal Rule of Civil Procedure 17(b). Defendants target their business activities toward consumers throughout the United States, including within this district, through the simultaneous operation of commercial Internet based e-commerce stores under the Seller IDs.

10.     Defendants use aliases in connection with the operation of their businesses, including but not limited to those identified by Defendant Number on Schedule "A."

11.     Defendants are the past and present controlling force behind the sale of products bearing and/or using counterfeits and infringements of Plaintiffs' individual trademarks as

described herein.

12.    Defendants directly engage in unfair competition with Plaintiffs by advertising, offering for sale, and selling goods, each using counterfeits and infringements of one or more of Plaintiffs' individual trademarks to consumers within the United States and this district through at least, the Internet based e-commerce stores using, at least, the Seller IDs, as well as additional seller identification aliases not yet known to Plaintiffs. Defendants have purposefully directed some portion of their unlawful activities towards consumers in the State of Florida through the advertisement, offer to sell, sale, and/or shipment of counterfeit and infringing branded versions of one or more of Plaintiffs' goods into the State.

13.    Defendants have registered, established or purchased, and maintained their Seller IDs. Defendants may have engaged in fraudulent conduct with respect to the registration of the Seller IDs by providing false and/or misleading information during the registration or maintenance process related to their respective Seller ID. Many Defendants have registered and/or maintained some of their Seller IDs for the sole purpose of engaging in unlawful counterfeiting and/or infringing activities.

14.    Defendants will likely continue to register or acquire new seller identification names or other aliases, as well as related payment accounts, for the purpose of selling and offering for sale goods using counterfeit and confusingly similar imitations of one or more of Plaintiffs' trademarks unless preliminarily and permanently enjoined.

15.    Defendants' Seller IDs, associated payment accounts, and any other alias e-commerce store names used in connection with the sale of counterfeit and infringing goods using one or more of Plaintiffs' trademarks are essential components of Defendants' online activities and are the means by which Defendants further their counterfeiting and infringing scheme and

cause harm to Plaintiffs. Moreover, Defendants are using Plaintiffs' respective famous names and/or associated trademarks to drive Internet consumer traffic to their e-commerce stores operating under the Seller IDs, thereby increasing the value of the Seller IDs and decreasing the size and value of Plaintiffs' legitimate marketplace and intellectual property rights at Plaintiffs' expense.

## COMMON FACTUAL ALLEGATIONS

### Luxottica's Business and Trademark Rights

16.     Luxottica is the owner of all rights in and to the following trademarks which are valid and registered on the Principal Register of the United States Patent and Trademark Office (collectively, the "RAY-BAN Marks"):

| Trademark | Registration Number | Registration Date | Class(es) / Good(s) |
|-----------|---------------------|-------------------|---------------------|
| G-15 | 0,590,522 | June 1, 1954 | IC 009. Sunglasses and ophthalmic lenses. |
| WAYFARER | 0,595,513 | September 21, 1954 | IC 009. Sunglasses. |
| *Ray·Ban* | 0,650,499 | August 20, 1957 | IC 009. Sunglasses, shooting glasses, and ophthalmic lenses. |
| RAY-BAN | 1,080,886 | January 3, 1978 | IC 009. Ophthalmic products and accessories-namely, sunglasses; eyeglasses; spectacles; lenses and frames for sunglasses, eyeglasses, spectacles. |
| *Ray-Ban* | 1,093,658 | June 20, 1978 | IC 009. Ophthalmic products and accessories; namely, sunglasses; eyeglasses; spectacles; lenses and frames for sunglasses, eyeglasses, spectacles; and cases and other protective covers for sunglasses, eyeglasses, and spectacles. |

| Trademark | Registration Number | Registration Date | Class(es) / Good(s) |
|---|---|---|---|
| LUXOTTICA | 1,254,409 | October 18, 1983 | IC 009. Eyeglasses, sunglasses, templates and eyeglass frames. |
| *Ray-Ban* | 1,320,460 | February 19, 1985 | IC 009. Sunglasses and carrying cases therefor. |
| LUXOTTICA ☆☆ | 1,511,615 | November 8, 1988 | IC 009. Eyeglasses, sunglasses, temples and eyeglass frames. |
| CLUBMASTER | 1,537,974 | May 9, 1989 | IC 009. Sunglasses. |
| *Ray-Ban* | 1,726,955 | October 27, 1992 | IC 018. Bags; namely, tote, duffle and all purpose sports bags.<br><br>IC 021. Cloths for cleaning ophthalmic products.<br><br>IC 025. Clothing and headgear, namely, hats. |
| *RB* | 2,971,023 | July 19, 2005 | IC 009. Sunglasses, eyeglasses, eyeglass lenses. |
| *Ray-Ban* | 3,522,603 | October 21, 2008 | IC 009. Sunglasses, eyeglasses, lenses for eyeglasses, eyeglasses frames, and cases for eyeglasses. |

The RAY-BAN Marks are used in connection with the manufacture and distribution of high-quality goods in the categories identified above. True and correct copies of the Certificates of Registration for the RAY-BAN Marks are attached hereto as Composite Exhibit "1."

17.    The RAY-BAN Marks have been used in interstate commerce to identify and distinguish Luxottica's high-quality goods for an extended period of time.

7

18.     The RAY-BAN Marks have been used in commerce by Luxottica long prior in time to Defendants' use of copies of those Marks. The RAY-BAN Marks have never been assigned or licensed to any of the Defendants in this matter.

19.     The RAY-BAN Marks are symbols of Luxottica's quality, reputation, and goodwill and have never been abandoned. Luxottica has carefully monitored and policed the use of its intellectual property, including the RAY-BAN Marks.

20.     The RAY-BAN Marks are well known and famous and have been for many years. Luxottica expends substantial resources developing, advertising, and otherwise promoting the RAY-BAN Marks. The RAY-BAN Marks qualify as famous marks as that term is used in 15 U.S.C. §1125(c)(1).

21.     Further, Luxottica extensively uses, advertises, and promotes the RAY-BAN Marks in the United States in association with the sale of high-quality goods. Luxottica has expended substantial resources promoting the RAY-BAN Marks and products bearing and/or using the RAY-BAN Marks on the Internet and via its official website, www.ray-ban.com. In recent years, annual sales of products bearing and/or using the RAY-BAN Marks have totaled well into the many millions of dollars within the United States.

22.     As a result of Luxottica's efforts, members of the consuming public readily identify merchandise bearing or sold using the RAY-BAN Marks as being high quality goods sponsored and approved by Luxottica.

23.     Accordingly, the RAY-BAN Marks have achieved secondary meaning among consumers as identifiers of high-quality goods.

24.     Genuine goods bearing and/or using the RAY-BAN Marks are widely legitimately advertised and promoted by Luxottica, its authorized distributors, and unrelated third parties via

the Internet. Visibility on the Internet, particularly via Internet search engines and social media platforms, is important to Luxottica's overall marketing and consumer education efforts. Thus, Luxottica expends significant monetary and other resources on Internet marketing and consumer education, including search engine optimization ("SEO") and search engine marketing ("SEM"), and social media strategies. Those strategies allow Luxottica and its authorized retailers to educate consumers fairly and legitimately about the value associated with the RAY-BAN Marks and the goods sold thereunder, and the problems associated with the counterfeiting of the RAY-BAN Marks.

**Oakley's Business and Trademark Rights**

25.     Oakley is the owner of all rights in and to the following trademarks which are valid and registered on the Principal Register of the United States Patent and Trademark Office (collectively, the "OAKLEY Marks"):

| Trademark | Registration Number | Registration Date | Class(es) / Good(s) |
|---|---|---|---|
| **OAKLEY** | 1,356,297 | August 27, 1985 | IC 009. Goggles, sunglasses and protective pads for elbows, feet and knees.<br><br>IC 025. Clothing - namely t-shirts; gloves; racing pants; hats; sweatshirts; sport shirts, jackets, jeans, jerseys and ski pants, jackets, hats, gloves and socks. |
| **OAKLEY** | 1,519,596 | January 10, 1989 | IC 009. Sunglasses and accessories for sunglasses, namely, replacement lenses, ear stems and nose pieces. |
| OAKLEY | 1,521,599 | January 24, 1989 | IC 009. Sunglasses and accessories for sunglasses. |

| Trademark | Registration Number | Registration Date | Class(es) / Good(s) |
|---|---|---|---|
| M FRAME | 1,701,476 | July 21, 1992 | IC 009. Protective eyewear; namely, goggles, anti-glare glasses; sunglasses and their parts; namely, lenses, replacement lenses, frames, earstems and nose pieces; cases specially adapted for sunglasses and their parts. |
|  | 1,980,039 | June 11, 1996 | IC 009. Protective and/or anti-glare eyewear, namely sunglasses, goggles, spectacles and their parts and accessories, namely replacement lenses, earstems, frames, nose pieces and foam strips; cases specially adapted for protective and/or anti-glare eyewear and their parts and accessories. |
|  | 1,984,501 | July 02, 1996 | IC 009. Protective and/or anti-glare eyewear, namely sunglasses, goggles, spectacles and their parts and accessories, namely replacement lenses, ear stems, frames, nose pieces and foam strips; cases specially adapted for protective and/or anti-glare eyewear and their parts and accessories. |
|  | 2,393,107 | October 10, 2000 | IC 009. Protective eyewear, namely, spectacles, anti-glare glasses and sunglasses and parts thereof, namely frames and earstems. |
|  | 2,403,609 | November 14, 2000 | IC 009. Protective eyewear, namely, spectacles, anti-glare glasses, and sunglasses and parts thereof, namely, frames and earstems. |
|  | 3,151,994 | October 3, 2006 | IC 009 Protective eyewear, namely spectacles, prescription eyewear, anti glare glasses and sunglasses and their parts and accessories, namely replacement lenses, frames, earstems, and nose pieces; cases specially adapted for spectacles and sunglasses and their parts and accessories. |

| Trademark | Registration Number | Registration Date | Class(es) / Good(s) |
|---|---|---|---|
| OAKLEY | 3,153,943 | October 10, 2006 | IC 009. Prescription eyewear, namely, sunglasses and spectacles; eyewear containing electronics devices, namely, protective eyewear, eyeglasses, sunglasses and spectacles; electronics, namely portable digital electronic devices for recording, organizing, and reviewing text, data and audio files; computer software for use in recording, organizing, and reviewing text, data and audio files on portable digital electronic devices; transmitters, receivers, speakers and parts thereof for use with cellular, wireless computer and telephone communication systems; communication devices for use on eyewear, namely earpieces, transmitters, receivers, speakers and parts thereof for use with cellular, wireless computer and telephone communication systems; wearable audio visual display, namely, protective eyewear, eyeglasses, sunglasses and spectacles containing an audio visual display; wireless telecommunications modules. |
| GASCAN | 3,245,494 | May 22, 2007 | IC 009. Protective eyewear, namely spectacles, prescription eyewear, anti glare glasses and sunglasses and their parts and accessories, namely replacement lenses, frames, earstems, and nose pieces; cases specially adapted for spectacles and sunglasses and their parts and accessories. |

| Trademark | Registration Number | Registration Date | Class(es) / Good(s) |
|---|---|---|---|
|  | 3,331,124 | November 6, 2007 | IC 009. Protective eyewear, namely spectacles, prescription eyewear, anti glare glasses and sunglasses and their parts and accessories, namely replacement lenses, frames, earstems, and nose pieces; cases specially adapted for spectacles and sunglasses and their parts and accessories; and protective clothing, namely, racing pants.<br><br>IC 025. Clothing, namely, t-shirts, beach-wear, blouses, sports shirts, jerseys, swimwear, swimtrunks, shorts, underwear, shirts, pants, ski and snowboard pants and jackets, jeans, vests, jackets, wetsuits, sweaters, pullovers, coats, sweatpants, headwear, namely, hats, caps, visors and footwear, namely wetsuit booties, shoes, sandals, athletic footwear, all purpose sports footwear, thongs and boots. |
| RADAR | 3,379,110 | February 5, 2008 | IC 009. Protective eyewear, namely, spectacles, prescription eyewear, anti glare glasses and sunglasses and their parts and accessories, namely, replacement lenses, frames, earstems, and nose pieces; cases specially adapted for spectacles and sunglasses and their parts and accessories. |
| OIL RIG | 3,489,952 | August 19, 2008 | IC 009. Protective eyewear, namely, spectacles, prescription eyewear, anti glare glasses and sunglasses and their parts and accessories, namely, replacement lenses, frames, earstems, and nose pieces; cases specially adapted for spectacles and sunglasses and their parts and accessories. |
| FROGSKINS | 4,194,197 | August 21, 2012 | IC 009. Eyewear, namely sunglasses and accessories for sunglasses, namely, replacement lenses, ear stems and nose pieces. |

| Trademark | Registration Number | Registration Date | Class(es) / Good(s) |
|---|---|---|---|
| PRIZM | 4,813,708 | September 15, 2015 | IC 009. Protective and/or anti-glare eyewear, namely, sunglasses, spectacles and their parts and accessories, namely, replacement lenses, earstems, frames, nose pieces and foam strips; cases specially adapted for protective and/or anti-glare eyewear, their parts and their accessories, namely, replacement lenses, earstems, frames, nose pieces and foam strips. |
| HOLBROOK | 5,636,292 | December 25, 2018 | IC 009. Eyewear, namely, sunglasses, goggles for sports, spectacles and their parts and accessories, namely, replacement lenses, ear stems, frames, nose pieces and foam strips; cases specifically adapted for eyewear and their parts and accessories. |

The OAKLEY Marks are used in connection with the manufacture and distribution of high-quality goods in the categories identified above. True and correct copies of the Certificates of Registration for the OAKLEY Marks are attached hereto as Composite Exhibit "2."

26.     The OAKLEY Marks have been used in interstate commerce to identify and distinguish Oakley's high-quality goods for an extended period of time.

27.     The OAKLEY Marks have been used in commerce by Oakley long prior in time to Defendants' use of copies of those Marks. The OAKLEY Marks have never been assigned or licensed to any of the Defendants in this matter.

28.     The OAKLEY Marks are symbols of Oakley's quality, reputation, and goodwill and have never been abandoned. Oakley has carefully monitored and policed the use of the OAKLEY Marks.

29.     The OAKLEY Marks are well known and famous and have been for many years. Oakley expends substantial resources in developing, advertising, and otherwise promoting the

OAKLEY Marks. The OAKLEY Marks qualify as famous marks as that term is used in 15 U.S.C. §1125(c)(1).

30.     Further, Oakley extensively uses, advertises, and promotes the OAKLEY Marks in the United States in association with the sale of high-quality goods. Oakley has expended enormous resources promoting the OAKLEY Marks and products bearing and/or using the OAKLEY Marks on the Internet and via its official website, www.oakley.com. In recent years, annual sales of products bearing and/or using the OAKLEY Marks have totaled well into the many millions of dollars within the United States.

31.     As a result of Oakley's efforts, members of the consuming public readily identify merchandise bearing or sold using the OAKLEY Marks as being high quality goods sponsored and approved by Oakley.

32.     Accordingly, the OAKLEY Marks have achieved secondary meaning among consumers as identifiers of high-quality goods.

33.     Genuine goods bearing and/or using the OAKLEY Marks are widely legitimately advertised and promoted by Oakley, its authorized distributors, and unrelated third parties via the Internet. Visibility on the Internet, particularly via Internet search engines and social media platforms, is important to Oakley's overall marketing and consumer education efforts. Thus, Oakley expends significant monetary and other resources on Internet marketing and consumer education, including search engine optimization ("SEO") search engine marketing ("SEM"), and social media strategies. Those strategies allow Oakley and its authorized retailers to educate consumers fairly and legitimately about the value associated with the OAKLEY Marks and the goods sold thereunder, and the problems associated with the counterfeiting of the OAKLEY Marks.

**Defendants' Infringing Activities**

34.     Defendants are each promoting and advertising, distributing, selling, and/or offering for sale goods in interstate commerce using counterfeit and confusingly similar imitations of one or more of the RAY-BAN Marks and/or the OAKLEY Marks (the "Counterfeit Goods") through at least the e-commerce stores operating under the Seller IDs. Specifically, Defendants are using the RAY-BAN Marks and/or the OAKLEY Marks (collectively "Plaintiffs' Marks") to initially attract online consumers and drive them to Defendants' e-commerce stores operating under the Seller IDs. Defendants are each using virtually identical copies of one or more of Plaintiffs' Marks for different quality goods. Plaintiffs have used their respective trademarks extensively and continuously before Defendants began offering goods using counterfeit and confusingly similar imitations of Plaintiffs' merchandise.

35.     Defendants' Counterfeit Goods are of a quality substantially different than that of Plaintiffs' respective, genuine goods. Defendants are actively using, promoting and otherwise advertising, distributing, selling and/or offering for sale substantial quantities of their Counterfeit Goods with the knowledge and intent that such goods will be mistaken for Plaintiffs' genuine high-quality goods despite Defendants' knowledge that they are without authority to use Plaintiffs' Marks. Defendants' actions are likely to cause confusion of consumers, at the time of initial interest, sale, and in the post-sale setting, who will believe all of Defendants' goods offered for sale in Defendants' e-commerce stores are genuine goods originating from, associated with, and/or approved by Plaintiffs.

36.     Defendants advertise their e-commerce stores, including their Counterfeit Goods offered for sale, to the consuming public using at least the Seller IDs. In so doing, Defendants improperly and unlawfully use one or more of Plaintiffs' Marks without Plaintiffs' permission.

37.     Most Defendants are concurrently employing and benefitting from substantially similar advertising and marketing strategies based, in large measure, upon an unauthorized use of counterfeits and infringements of Plaintiffs' Marks. Specifically, Defendants are using counterfeits and infringements of at least one of Plaintiffs' famous names or Plaintiffs' Marks to make their e-commerce stores selling unauthorized goods appear more relevant and attractive to consumers searching for both Plaintiffs' and non-Plaintiffs' goods and information online. By their actions, Defendants are contributing to the creation and maintenance of an unlawful marketplace operating in parallel to the legitimate marketplace for Plaintiffs' respective genuine goods. Defendants are causing individual, concurrent and indivisible harm to Plaintiffs and the consuming public by (i) depriving Plaintiffs and other third parties of their right to fairly compete for space within search engine results and reducing the visibility of Plaintiffs' genuine goods on the World Wide Web, (ii) causing an overall degradation of the value of the goodwill associated with Plaintiffs' Marks, and (iii) increasing Plaintiffs' overall cost to market their goods and educate consumers about their brands via the Internet.

38.     Defendants are concurrently conducting and targeting their counterfeiting and infringing activities towards consumers and likely causing unified harm within this district and elsewhere throughout the United States. As a result, Defendants are defrauding Plaintiffs and the consuming public for Defendants' own benefit.

39.     At all times relevant hereto, Defendants have had full knowledge of Plaintiffs' respective ownership of Plaintiffs' Marks, including their respective, exclusive rights to use and license such intellectual property and the goodwill associated therewith.

40.     Defendants' use of Plaintiffs' Marks, including the promotion and advertisement, reproduction, distribution, sale and offering for sale of their Counterfeit Goods, is without Plaintiffs' consent or authorization.

41.     Defendants are engaging in the above-described illegal counterfeiting and infringing activities knowingly and intentionally or with reckless disregard or willful blindness to Plaintiffs' rights for the purpose of trading on Plaintiffs' goodwill and reputation.  If Defendants' intentional counterfeiting and infringing activities are not preliminarily and permanently enjoined by this Court, Plaintiffs and the consuming public will continue to be harmed.

42.     Defendants' above identified infringing activities are likely to cause confusion, deception, and mistake in the minds of consumers, before, during and after the time of purchase. Moreover, Defendants' wrongful conduct is likely to create a false impression and deceive customers, the public, and the trade into believing there is a connection or association between Plaintiffs' respective, genuine goods and Defendants' Counterfeit Goods, which there is not.

43.     Given the visibility of Defendants' various e-commerce stores and the similarity of their concurrent actions, it is clear Defendants are either affiliated, or at a minimum, cannot help but know of each other's existence and the unified harm likely to be caused to Plaintiffs and the overall consumer market in which they operate as a result of Defendants' concurrent actions.

44.     Although some Defendants may be physically acting independently, they may properly be deemed to be acting in concert because the combined force of their actions serves to multiply the harm caused to Plaintiffs.

45.     Defendants' payment and financial accounts, including but not limited to those specifically set forth on Schedule "A," are being used by Defendants to accept, receive, and deposit profits from Defendants' trademark counterfeiting and infringing, and unfairly competitive

activities connected to their Seller IDs and any other alias seller identification names being used and/or controlled by them.

46.     Further, Defendants, upon information and belief, are likely to transfer or secret their assets to avoid payment of any monetary judgment awarded to Plaintiffs.

47.     Plaintiffs have no adequate remedy at law.

48.     Plaintiffs are suffering irreparable injury because of Defendants' unauthorized and wrongful use of Plaintiffs' Marks. If Defendants' counterfeiting, infringing, and unfairly competitive activities are not preliminarily and permanently enjoined by this Court, Plaintiffs and the consuming public will continue to be harmed while Defendants wrongfully earn a substantial profit.

49.     The harm sustained by Plaintiffs has been directly and proximately caused by Defendants' wrongful reproduction, use, advertisement, promotion, offers to sell, and sale of their Counterfeit Goods.

### COUNT I - TRADEMARK COUNTERFEITING AND INFRINGEMENT PURSUANT TO § 32 OF THE LANHAM ACT (15 U.S.C. § 1114)

50.     Plaintiffs hereby adopt and re-allege the allegations set forth in Paragraphs 1 through 49 above.

51.     This is an action for trademark counterfeiting and infringement against Defendants based on their use of counterfeit and confusingly similar imitations of Plaintiffs' Marks in commerce in connection with the promotion, advertisement, distribution, offering for sale, and sale of the Counterfeit Goods.

52.     Specifically, Defendants are promoting and otherwise advertising, selling, offering for sale, and distributing goods using and/or bearing counterfeits and/or infringements of one or more of Plaintiffs' Marks.  Defendants are continuously infringing and inducing others to infringe

Plaintiffs' Marks by using one or more of Plaintiffs' Marks to advertise, promote, offer to sell, and/or sell counterfeit and infringing versions of Plaintiffs' branded goods.

53.     Defendants' concurrent counterfeiting and infringing activities are likely to cause and are causing confusion, mistake, and deception among members of the trade and the general consuming public as to the origin and quality of Defendants' Counterfeit Goods.

54.     Defendants' unlawful actions have caused and are continuing to cause unquantifiable and irreparable harm to Plaintiffs and are unjustly enriching Defendants with profits at Plaintiffs' expense.

55.     Defendants' above-described unlawful actions constitute counterfeiting and infringement of Plaintiffs' Marks in violation of Plaintiffs' rights under § 32 of the Lanham Act, 15 U.S.C. § 1114.

56.     Plaintiffs have each suffered and will continue to suffer irreparable injury while Defendants are earning a substantial profit due to Defendants' above-described activities, if Defendants are not preliminarily and permanently enjoined.

## COUNT II - FALSE DESIGNATION OF ORIGIN
## PURSUANT TO § 43(a) OF THE LANHAM ACT (15 U.S.C. § 1125(a))

57.     Plaintiffs hereby adopt and re-allege the allegations set forth in Paragraphs 1 through 49 above.

58.     Defendants' Counterfeit Goods bearing, offered for sale, and sold using copies of one or more of Plaintiffs' Marks have been widely advertised and offered for sale throughout the United States via the Internet based e-commerce stores operating under the Seller IDs.

59.     Defendants' Counterfeit Goods bearing, offered for sale, and sold using copies of one or more of Plaintiffs' Marks are virtually identical in appearance to Plaintiffs' respective, genuine goods.  However, Defendants' Counterfeit Goods are different in quality.  Accordingly,

Defendants' activities are likely to cause confusion among consumers as to at least the origin or sponsorship of their Counterfeit Goods.

60.     Defendants have used in connection with their advertisement, offer for sale, and sale of the Counterfeit Goods, false designations of origin and false descriptions and representations, including words or symbols and designs, which falsely describe or represent such goods and have caused such goods to enter commerce in the United States with full knowledge of the falsity of such designations of origin and such descriptions and representations, all to Plaintiffs' detriment.

61.     Defendants have each authorized infringing uses of one or more of Plaintiffs' Marks in Defendants' advertisement and promotion of their counterfeit and infringing branded goods. Some Defendants have also misrepresented to members of the consuming public that the Counterfeit Goods they advertise and sell are genuine, non-infringing goods.

62.     Additionally, many Defendants are simultaneously using counterfeits and infringements of one or more of Plaintiffs' Marks to unfairly compete with Plaintiffs and others for space within organic and paid search engine and social media results. Defendants are thereby jointly (i) depriving Plaintiffs of valuable marketing and educational space online which would otherwise be available to Plaintiffs and (ii) reducing the visibility of Plaintiffs' genuine goods on the World Wide Web and across social media platforms.

63.     Defendants' above-described actions are in violation of Section 43(a) of the Lanham Act, 15 U.S.C. §1125(a).

64.     Plaintiffs have no adequate remedy at law and have sustained both individual and indivisible injury caused by Defendants' concurrent conduct. Absent an entry of an injunction by this Court, Plaintiffs will continue to suffer irreparable injury to their goodwill and business

reputations, while Defendants are earning a substantial profit.

## COUNT III - COMMON LAW UNFAIR COMPETITION.

65.     Plaintiffs hereby adopt and re-allege the allegations set forth in Paragraphs 1 through 49 above.

66.     This is an action against Defendants based on their promotion, advertisement, distribution, sale, and/or offering for sale of goods using or bearing marks which are virtually identical to one or more of Plaintiffs' Marks, in violation of Florida's common law of unfair competition.

67.     Specifically, Defendants are promoting and otherwise advertising, selling, offering for sale, and distributing infringing and counterfeit versions of Plaintiffs' branded goods. Defendants are also each using counterfeits and infringements of one or more of Plaintiffs' Marks to unfairly compete with Plaintiffs and others for (i) space in search engine and social media results across an array of search terms and/or (ii) visibility on the World Wide Web.

68.     Defendants' infringing activities are likely to cause and are causing confusion, mistake, and deception among the consumers as to the origin and quality of Defendants' e-commerce stores as a whole and all products sold therein by their use of Plaintiffs' Marks.

69.     Plaintiffs have no adequate remedy at law and are suffering irreparable injury because of Defendants' actions, while Defendants are earning a substantial profit.

## COUNT IV - COMMON LAW TRADEMARK INFRINGEMENT

70.     Plaintiffs hereby adopt and re-allege the allegations set forth in Paragraphs 1 through 49 above.

71.     Plaintiffs are the respective owners of all common law rights in and to their respective Plaintiffs' Marks.

72.     This is an action for common law trademark infringement against Defendants based on their promotion, advertisement, offering for sale, and/or sale of their Counterfeit Goods bearing and/or using one or more of Plaintiffs' Marks.

73.     Specifically, each Defendant is promoting and otherwise advertising, distributing, offering for sale, and selling goods bearing and/or using infringements of one or more of Plaintiffs' Marks.

74.     Defendants' infringing activities are likely to cause and are causing confusion, mistake and deception among the consumers as to the origin and quality of Defendants' Counterfeit Goods bearing and/or using Plaintiffs' Marks.

75.     Plaintiffs have no adequate remedy at law and are suffering damages and irreparable injury because of Defendants' actions, while Defendants are earning a substantial profit.

**<u>PRAYER FOR RELIEF</u>**

76.     WHEREFORE, Plaintiffs demand judgment on all Counts of this Complaint and an award of equitable relief and monetary relief against Defendants as follows:

a.      Entry of temporary, preliminary, and permanent injunctions pursuant to 15 U.S.C. § 1116, 28 U.S.C. § 1651(a), The All Writs Act, and Federal Rule of Civil Procedure 65 enjoining Defendants, their agents, representatives, servants, employees, and all those acting in concert or participation therewith, from manufacturing or causing to be manufactured, importing, advertising or promoting, distributing, selling or offering to sell their Counterfeit Goods; from infringing, counterfeiting, or diluting Plaintiffs' Marks; from using Plaintiffs' Marks, or any mark or design similar thereto, in connection with the sale of any unauthorized goods; from using any logo, trade name or trademark or design that may be calculated to falsely advertise the services or

goods of Defendants as being sponsored by, authorized by, endorsed by, or in any way associated with Plaintiffs; from falsely representing themselves as being connected with Plaintiffs, through sponsorship or association, or engaging in any act that is likely to falsely cause members of the trade and/or of the purchasing public to believe any goods or services of Defendants, are in any way endorsed by, approved by, and/or associated with Plaintiffs; from using any reproduction, counterfeit, infringement, copy, or colorable imitation of Plaintiffs' Marks in connection with the publicity, promotion, sale, or advertising of any goods sold by Defendants; from affixing, applying, annexing or using in connection with the sale of any goods, a false description or representation, including words or other symbols tending to falsely describe or represent Defendants' goods as being those of Plaintiffs, or in any way endorsed by Plaintiffs and from offering such goods in commerce; from engaging in search engine optimization strategies using colorable imitations of Plaintiffs' name or trademarks and from otherwise unfairly competing with Plaintiffs.

b.     Entry of temporary restraining order, as well as preliminary and permanent injunctions pursuant to 28 U.S.C. § 1651(a), The All Writs Act, and the Court's inherent authority, enjoining Defendants and all third parties with actual notice of an injunction issued by the Court from participating in, including providing financial services, technical services or other support to, Defendants in connection with the sale and distribution of non-genuine goods bearing and/or using counterfeits of Plaintiffs' Marks.

c.     Entry of an order pursuant to 15 U.S.C. § 1116, 28 U.S.C. § 1651(a), The All Writs Act, and the Court's inherent authority, that, upon Plaintiffs' request, Defendants and the top level domain (TLD) Registry for the e-commerce stores used by Defendants, or their administrators, including backend registry operators or administrators, place the e-commerce

stores on Registry Hold status for the remainder of the registration period for any such e-commerce stores, thus removing them from the TLD zone files which link any e-commerce stores being used and/or controlled by Defendants to engage in the business of marketing, offering to sell, and/or selling goods bearing and/or using counterfeits and infringements of Plaintiffs' Marks, to the IP addresses where the associated e-commerce stores are hosted.

       d.     Entry of an order pursuant to 28 U.S.C. § 1651(a), The All Writs Act, and the Court's inherent authority, canceling for the life of the current registration or, at Plaintiffs' election, transferring any e-commerce stores used by Defendants to engage in their counterfeiting of Plaintiffs' Marks at issue to Plaintiffs' control so they may no longer be used for unlawful purposes.

       e.     Entry of an order pursuant to 15 U.S.C. § 1116 and the Court's inherent authority, requiring Defendants, their agent(s) or assign(s), to assign all rights, title, and interest, to any e-commerce stores used by Defendants to Plaintiffs and, if within five (5) days of entry of such order Defendants fail to make such an assignment, the Court order the act to be done by another person appointed by the Court at Defendants' expense, such as the Clerk of Court, pursuant to Federal Rule of Civil Procedure 70(a).

       f.     Entry of an order pursuant to 15 U.S.C. § 1116 and the Court's inherent authority, requiring Defendants, their agent(s) or assign(s), to instruct all search engines to permanently delist or deindex any e-commerce stores used by Defendants, and, if within five (5) days of entry of such order Defendants fail to make such a written instruction, the Court order the act to be done by another person appointed by the Court at Defendants' expense, such as the Clerk of Court, pursuant to Federal Rule of Civil Procedure 70(a).

g.      Entry of an order pursuant to 28 U.S.C. § 1651(a), The All Writs Act, and the Court's inherent authority, authorizing Plaintiffs to serve the injunction issued by the Court on any e-mail service provider with a request that the service provider permanently suspend the e-mail addresses which are or have been used by Defendants in connection with Defendants' promotion, offering for sale, and/or sale of goods using counterfeits and/or infringements of Plaintiffs' Marks.

h.      Entry of an order requiring, upon Plaintiffs' request, Defendants to request in writing permanent termination of any messaging services, user names, e-commerce stores, and social media accounts they own, operate, or control on any messaging service, e-commerce marketplace, and social media website.

i.      Entry of an order pursuant to 28 U.S.C. § 1651(a), The All Writs Act, and the Court's inherent authority, that, upon Plaintiffs' request, the applicable governing Internet marketplace website operators and/or administrators for the Seller IDs who are provided with notice of an injunction issued by the Court disable and/or cease facilitating access to the Seller IDs, and any other alias e-commerce stores and seller identification names being used and/or controlled by Defendants to engage in the business of marketing, offering to sell and/or selling goods bearing counterfeits and infringements of Plaintiffs' Marks.

j.      Entry of an order pursuant to 28 U.S.C. § 1651(a), The All Writs Act, and the Court's inherent authority, that, upon Plaintiffs' request, any Internet marketplace website operators and/or administrators, registrar and/or top level domain (TLD) Registry for the Seller IDs and any other alias seller identification names being used by Defendants who are provided with notice of an injunction issued by the Court, identify any e-mail address known to be associated with Defendants' respective Seller ID.

k.      Entry of an order pursuant to 28 U.S.C. § 1651(a), The All Writs Act, and the Court's inherent authority, that, upon Plaintiffs' request, any messaging service, Internet marketplace and social media website operators and/or administrators who are provided with notice of an injunction issued by the Court, permanently remove any and all listings and associated images of goods bearing and/or using counterfeits and/or infringements of Plaintiffs' Marks via the e-commerce stores operating under the Seller IDs, and upon Plaintiffs' request, any other listings and images of goods bearing and/or using counterfeits and/or infringements of Plaintiffs' Marks associated with or linked to the same sellers or linked to any other alias and seller identification names being used and/or controlled by Defendants to promote, offer for sale and/or sell goods bearing counterfeits and/or infringements of Plaintiffs' Marks.

l.      Entry of an order pursuant to 28 U.S.C. § 1651(a), The All Writs Act, Federal Rule of Civil Procedure 65, and the Court's inherent authority, that, upon Plaintiffs' request, Defendants and any operators and/or administrators for the Seller IDs who are provided with notice of an injunction issued by the Court, immediately cease fulfillment of and sequester all goods of each Defendant bearing and/or using one or more of Plaintiffs' Marks in its inventory, possession, custody, or control, and surrender those goods to Plaintiffs.

m.      Entry of an order requiring Defendants to account to and pay Plaintiffs for all profits earned from Defendants' trademark counterfeiting and infringing and unfairly competitive activities and that the profit award to Plaintiffs be trebled, as provided for under 15 U.S.C. §1117, or that Plaintiffs be awarded statutory damages from each Defendant in the amount of two million dollars ($2,000,000.00) per each counterfeit trademark used and product type sold, as provided by 15 U.S.C. §1117(c)(2) of the Lanham Act.

n.      Entry of an award pursuant to 15 U.S.C. § 1117 (a) and (b) of Plaintiffs' costs and reasonable attorneys' fees and investigative fees associated with bringing this action.

o.      Entry of an order pursuant to 15 U.S.C. § 1116, 28 U.S.C. § 1651(a), The All Writs Act, Federal Rule of Civil Procedure 65, and the Court's inherent authority that, upon Plaintiffs' request, Defendants and any financial institutions, payment processors, banks, escrow services, money transmitters, or marketplace platforms, and their related companies and affiliates, identify and restrain all funds, up to and including the total amount of judgment, in all financial accounts and/or sub-accounts used in connection with the Seller IDs, or other alias seller identification names used by Defendants presently or in the future, as well as any other related accounts of the same customer(s) and any other accounts which transfer funds into the same financial institution account(s), and remain restrained until such funds are surrendered to Plaintiffs in partial satisfaction of the monetary judgment entered herein.

p.      Entry of an award of pre-judgment interest on the judgment amount.

q.      Entry of an Order requiring Defendants, at Plaintiffs' request, to pay the cost necessary to correct any erroneous impression the consuming public may have received or derived concerning the nature, characteristics, or qualities of Defendants' products, including without limitation, the placement of corrective advertising and providing written notice to the public.

r.      Entry of an order for any further relief as the Court may deem just and proper.

DATED: October 19, 2022.          Respectfully submitted,

STEPHEN M. GAFFIGAN, P.A.

By: **Stephen M. Gaffigan**
Stephen M. Gaffigan (Fla. Bar No. 025844)

Virgilio Gigante (Fla. Bar No. 082635)
T. Raquel Wiborg-Rodriguez (Fla. Bar. No. 103372)
401 East Las Olas Blvd., Suite 130-453
Ft. Lauderdale, Florida 33301
Telephone: (954) 767-4819
E-mail: Stephen@smgpa.net
E-mail: Leo@smgpa.net
E-mail: Raquel@smgpa.net

Attorneys for Plaintiffs

## SCHEDULE "A"

**[This page is the subject of Plaintiffs' Motion to File Under Seal.  As such, this page has been redacted in accordance with L.R. 5.4(b)(1)]**